UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:11-CV-00153-F

| | | |
|---|---|---|
| BARBARA GOODMAN, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| DEWAYNE BARBER, Individually | ) | |
| and in his official capacity as a Deputy | ) | |
| with the Sampson County Sheriff's | ) | |
| Office, and OHIO CASUALTY | ) | |
| INSURANCE, | ) | |
|     Defendants. | ) | |

This matter is before the court upon the Motion for Summary Judgment [DE-38] filed by Defendants Dewayne Barber and Ohio Casualty Insurance. The motion has been fully briefed and is ripe for ruling.

## I. PROCEDURAL AND FACTUAL HISTORY

Plaintiff Babara Goodman ("Goodman") initiated this action by filing a Complaint [DE-1-1] in Sampson County Superior court (a North Carolina state court) on June 20, 2011, alleging that Defendant Sampson County Sheriff's Deputy Dewayne Barber ("Deputy Barber") used excessive force while arresting Goodman. Pursuant to 28 U.S.C. § 1441, Deputy Barber removed the case to this court on July 27, 2011. On December 27, 2011, this court allowed Deputy Barber's unopposed motion to dismiss Goodman's claims based on the Fifth or Eight Amendments to the United States Constitution, her claims based on a respondeat superior theory, and her claims based on the North Carolina Constitution. [DE-24]. Defendant Ohio Casualty

Insurance ("Ohio Casualty") was added as a necessary party on February 20, 2012.

Goodman's remaining claims allege that Deputy Barber used excessive force while effectuating an arrest of Goodman, in violation of the Fourth and Fourteenth Amendments, and pursuant to 42 U.S.C. § 1983. Goodman also alleges state law claims for false imprisonment, malicious prosecution, and assault and battery.

Because Deputy Barber has moved for summary judgment, the court will relate the facts in the light most favorable Goodman. The court notes that Deputy Barber vigorously disputes Goodman's version of the facts. On June 19, 2008, Deputy Barber initiated a traffic stop of Goodman's brother, William Goodman. After Deputy Barber activated his blue lights, William Goodman turned into his family's property in Salemburg, North Carolina, and pulled the car over behind one of the residences on the property. Deputy Barber pulled in behind Goodman's car. Deputy Barber exited his patrol car and asked William Goodman for his license. William Goodman admitted that he did not have a valid driver's license. Deputy Barber instructed William Goodman to remain in his vehicle while Deputy Barber returned to his patrol car to check for outstanding warrants.

At this point, approximately nine members of William Goodman's family, including Plaintiff Barbara Goodman, approached the scene. Goodman alleges that the family members approached in a nonthreatening manner and that the family was simply curious about the traffic stop. Deputy Barber stated "this is a crime scene" and requested the family members to back up. Aff. of Barbara Goodman [DE-43-4] at 2. The family members complied with this request. Plaintiff Barbara Goodman again asked Deputy Barber about the traffic stop, and she alleges that Deputy Barber responded by stating "back the fuck up!" *Id.* Goodman admonished Deputy Barber that he should not use that language around children, and Goodman alleges that this

2

angered Deputy Barber.

The Sampson County Sheriff's office informed Deputy Barber that outstanding warrants for William Goodman's arrest had been located. Deputy Barber then exited his patrol car and placed William Goodman under arrest. As Deputy Barber effectuated the arrest of William Goodman, Goodman maintains that the family remained approximately ten yards away from the scene and that the family did not approach Deputy Barber's vehicle or try to interfere with the arrest in any way. Deputy Barber claims that the family members approached him in a threatening manner, and he radioed for back-up because he feared for his safety.

After Deputy Barber placed William Goodman in his patrol car, Goodman's sister-in-law asked Goodman to accompany her to the local detention center, in order to pay William Goodman's bond. Goodman agreed and began walking toward one of the residences on the property to retrieve her pocketbook. According to Goodman, Deputy Barber informed Goodman that "[y]ou're not going anywhere. I'm going to arrest you, too." Dep. of Barbara Goodman [DE-43-11] at 34. Deputy Barber then placed a single handcuff on Goodman's left wrist. Goodman's stepfather, William Beckwith ("Beckwith"), then grabbed Goodman's right arm and began twirling Goodman in a circular motion, in an attempt to prevent Deputy Barber from arresting Goodman. Deputy Barber then informed Beckwith that he was under arrest. At that point, Beckwith ran from Deputy Barber and Deputy Barber pursued Beckwith, leaving Goodman with only one hand handcuffed. Goodman alleges that at least one city police officer arrived on the scene at this point, and spoke with Goodman.[1]

Deputy Barber caught up to Beckwith and deployed his taser in an attempt to subdue

---

[1] Although the records is not clear as to the exact time the officers arrived, several back-up officers were present for at least part of the incident.

3

Beckwith. Goodman observed the taser deployment, and ran over to assist Beckwith, who has a heart condition. As Beckwith fell to the ground, Goodman placed her arms around him to ease his fall.

While Goodman was assisting Beckwith, Deputy Barber allegedly came up behind Goodman, pulled her away from Beckwith and threw her to the ground. After Goodman was completely subdued, Deputy Barber allegedly continued to hit her and maul her head and chest into the ground. In her Deposition, Goodman stated, "[t]hat's when Barber came up behind me, grabbed me, slung me down, hit him, and just mauled my head in the dirt. I mean, he just had his feets in my back. He was just mauling it." In a subsequent affidavit, Goodman stated,

> I ran over to where my step father was and grabbed him and was holding him when [Barber] grabbed me again by the one handcuff that he had on me. He then threw me to the ground by pulling my arm and causing my finger to break. I was in so much pain that I started screaming that my finger was broken. I was not thrashing my arms, or moving them in any erratic way. As I was on the ground he placed my other arm behind my back. Once he handcuffed me he continued to maul my face into the ground, hit me and started kneeing me in the back causing visual bruises.

Aff. of Barbara Goodman [DE 43-4] at 3.

Goodman suffered a fractured finger, contusion to her face, and a right knee abrasion. Goodman also suffered bruising to her arms and back. The fractured finger required surgery and physical therapy, and Goodman reports that she still has pain in her finger and problems grasping with her left hand. After the incident, Goodman was admitted to the Sampson County Hospital for one night to treat her injuries. The hospital discharged her the following day into the custody of the Sampson County Sheriff's Department.

The Sheriff's Department placed Goodman under arrest for resisting, delaying, or obstructing an officer ("RDO"). After trial in North Carolina District Court, Goodman was

found guilty of RDO. Goodman appealed the conviction to North Carolina Superior Court, and the prosecutor ultimately dismissed the charge. In noting the reason for dismissal, the state prosecutor checked "other" on the dismissal form. The prosecutor also wrote that "Defendant has no prior record and has performed sufficient community service in the way of volunteer work with the church." N.C. Criminal Court Documents [DE-39-3]. Notably, the prosecutor did not check the option labeled "Defendant has agreed to plead guilty in exchange for dismissal of the following charges." *Id.*

## II. STANDARD OF REVIEW

Deputy Barber now moves for summary judgment. At the summary judgment stage, the court must examine the evidence presented by both parties and determine if there is a need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Yarborough v. Montgomery*, 554 F. Supp. 2d 611, 614 (D.S.C. 2008). The court will examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986). Where the moving party shows that evidence is so one-sided that they should prevail as a matter of law, the burden shifts to the non-moving party to come forward with affidavits, depositions, answers to interrogatories, or other evidence, demonstrating that there is a genuine issue of material fact that requires trial. *Celotex Corp v. Catrett*, 477 U.S. 317, 324-25 (1986); *Matushita*, 475 U.S. at 587; *Clark v. Anderson*, 85 F.3d 146, 150 (4th Cir. 1996). An issue of fact is genuine if a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. A fact is material if proof of the fact might affect the outcome of the case under the substantive law. *Id.* In deciding the motion, the facts should be viewed in the light most favorable to the non-moving party, and all reasonable inferences should be made in favor of the

non-moving party. *Id.* at 255; *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996); *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 2005). However, the United States Supreme Court has noted that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record such that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. ANALYSIS

Deputy Barber makes two principle arguments in his motion for summary judgment: (1) that Deputy Barber did not use excessive force while arresting Goodman; and (2) that Deputy Barber is entitled to qualified immunity and is therefore immune from any suit arising from his arrest of Goodman. The court notes that the qualified immunity analysis requires the court to determine whether, viewing the facts in the light most favorable to Goodman, Deputy Barber used excessive force while arresting Goodman. *Scott*, 550 U.S. at 379; *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court will therefore proceed directly to the qualified immunity analysis.

### A. Qualified Immunity

Qualified immunity provides police officers and other government officials with immunity from suit for money damages "insofar as their conduct does not violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Scott*, 550 U.S. at 377. The qualified immunity analysis proceeds in two steps. The first question is "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right" *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier*, 533 U.S. at 201; *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010); and (2) "whether the right at issue was 'clearly established' at the time of the defendant's alleged

6

misconduct." *Scott*; 550 U.S. at 377; *Jones v. Buchanan*, 325 F.3d 520, 526 (4th Cir. 2003). A plaintiff must establish both prongs to survive the qualified immunity defense. *Pearson*, 555 U.S. at 232.

### 1. Whether a constitutional violation occurred.

Turning to the first question, the court must determine whether Goodman's claim that officer Barber used excessive force during her arrest "make[s] out a violation of a constitutional right." *Id.* at 232. The Fourth Amendment proscribes the use of excessive force by officers while effectuating an arrest. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) ("The Fourth Amendment's prohibition on unreasonable seizures includes the right to be fee of 'seizures effectuated by excessive force.' " (quoting *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006)). In *Graham v. Connor*, 490 U.S. 386 (1989), the United States Supreme Court held that a Fourth Amendment excessive force claim must be analyzed under the standard of "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. In applying this standard, the Fourth Circuit has explained that "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliot v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham*, 490 U.S. at 396-97); *Jones*, 325 F.3d at 527 (citing *Graham*, 490 U.S. at 396-97). The *Graham* court also noted that district courts must balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." *Graham*, 490 U.S. at 396 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983).

The objective reasonableness standard is "not capable of precise definition or mechanical application[,]" *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), and it "requires careful attention to the

7

facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. However, in examining the facts and circumstances, district courts should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *Jones*, 325 F.3d at 527. The Fourth Circuit has held that the extent of the Plaintiff's injury is also relevant. *Jones*, 325 F.3d at 527; *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). Finally, "a particular use of force must be judged from the perspective of a reasonable officer on the scene" and not "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Viewing the facts in the light most favorable to Goodman, the court cannot say that Deputy's Barber's use of force was objectively reasonable as a matter of law. The first factor of the Graham analysis—the severity of the crime at issue—actually weighs against Goodman. Goodman admits that while Deputy Barber attempted to arrest her, her stepfather moved her around in circles to prevent Deputy Barber from handcuffing Goodman's free hand. Goodman does not claim that she resisted her stepfather's actions or instructed him to stop so that Deputy Barber could complete the arrest. The court notes that this all occurred while Deputy Barber was outnumbered and surrounded by a number of Goodman's family members. By allowing a family member to spin her around in circles while Deputy Barber was outnumbered and surrounded, Goodman committed a serious crime: the family members could have easily attacked Deputy Barber while Goodman resisted arrest. Given the "particular facts and circumstances" of this case, the court finds that the crime Goodman was charged with, Resisting, Delaying, or Obstructing, was serious. *Cf. Valladares v. Cordero*, 552 F.3d 384, 390 (4th Cir. 2009) ("shoving" a police officer constitutes a severe crime under the first factor of *Graham*).

However, the second and third factors weigh in favor of a finding that Deputy Barber's

8

use of force was excessive. The second factor questions "whether the suspect poses an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. While it is debatable whether Goodman posed a threat to the officer when she was moved around in circles, and when she began walking to one of the residences on the property, Deputy Barber has failed to show how Goodman constituted a threat to the safety of the officers or others after she was fully restrained. Goodman's account of the facts, which the court takes as true at this stage, indicates that Deputy Barber continued to " maul my face into the ground, hit me and started kneeing me in the back causing visual bruises" after Deputy Barber had handcuffed both wrists and completely restrained her on the ground. Aff. of Barbara Goodman [DE 43-4] at 3. Goodman could not have posed an immediate threat to the officers or others after she was completely restrained. *See Jones*, 325 F.3d at 529 ("[I]f Jones was handcuffed behind his back in a locked room, we find it hard to see how he would pose an immediate threat to anyone"); *Valladeres*, 552 F.3d at 391 (finding second factor of *Graham* test weighed in favor of plaintiff where "the officer was able to control James before he broke the young man's jaw").

Under the third factor, the court examines whether the suspect was actively resisting arrest or attempting to evade arrest by flight. As explained above, Goodman alleges that Deputy Barber continued to use force during the arrest after she was completely restrained and was not resisting in any manner.[2] Taking Goodman's version of the facts as true, the court cannot say

---

[2] Deputy Barber also asserts judicial estoppel should prevent Goodman from arguing that she did not resist arrest. Judicial estoppel prevents a party from asserting a position that is inconsistent with a position taken in prior litigation. *Lowery v. Stovall*, 92 F.3d 291, 224 (4th Cir. 1996). Goodman was convicted in a North Carolina district court of Resisting, Delaying, or Obstructing an officer. She appealed her conviction and the prosecutor agreed to dismiss the charge at the Superior Court level. Deputy Barber argues that the charge was dismissed pursuant to a plea arrangement where the prosecutor agreed to dismiss the charge because the Plaintiff had a history of community service. Goodman contends that she pled not guilty at the district court level and that she maintained her innocence at the superior court level, but that the prosecutor

9

that Goodman was "actively resisting arrest" if both of her hands were handcuffed and Deputy Barber had fully pinned her to the ground. Thus, the third factor weighs in favor of Goodman as well. *See Bailey v. Kennedy*, 349 F.3d 731, 744 (4th Cir. 2003) ("[Plaintiff] was not resisting arrest when he was bound hand and foot and lying face down on the floor."); *Valladeres*, 552 F.3d at 390-91 ([Plaintiff] stopped resisting the arrest before the alleged excessive force occurred, which satisifes the last prong of the Graham analysis . . . .").

Thus, while the first factor from *Graham* weighs in favor of Deputy Barber, the second and third factors weigh in favor of Goodman. The court finds that, relying on Goodman's version of the facts, Deputy Barber's use of force was excessive and Goodman's constitutional right to be free from excessive force during an arrest was violated.[3] The first prong of the qualified immunity test is therefore satisfied and the court will now turn to the second prong. For qualified immunity to apply, Deputy Barber must show that Goodman's right to be free from

---

dismissed the charge because she had no record and had performed community service in the past. There is no record of a plea agreement, and the court papers indicate the prosecutor marked "other" as the reason for dismissal. On this limited evidence, the court will not employ judicial estoppel to prevent Goodman from arguing that she did not resist arrest. *See Wolfe v. Footen*, 418 Fed. Appx. 256, *260 (4th Cir. 2011) (denying judicial estoppel in excessive force case when Plaintiff pled guilty to assaulting officers but the state court record was too "incomplete" to apply estoppel the doctrine). Moreover, the court notes that the third factor in *Graham* questions whether the suspect was "actively resisting" arrest at the time the officer applied the allegedly excessive force. The fact that Goodman may have admitted she resisted arrest in state court does not mean she was resisting arrest at the time Deputy Barber allegedly employed excessive force.

[3] Of course, this also means that Deputy Barber's motion for summary judgment, to the extent it argues that Deputy Barber's use of force was reasonable as a matter of law, must fail. Relying on Goodman's version of the facts, a reasonable jury could find that Deputy Barber used excessive force because Goodman alleges that Deputy Barber continued to use force after she was completely restrained. Deputy Barber disputes this claim, which creates a genuine issue of material fact for trial.

10

factually similar uses of excessive force was "clearly established" at the time the incident occurred.

### 2. The "clearly established" prong of qualified immunity.

In *Hope v. Pelzer*, 536 U.S. 730, (2002), the United States Supreme Court explained that "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . .' " *Id.* at 739 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Fourth Circuit has held that courts must " 'define the right in light of the specific context of the case, not as a broad general proposition . . . . that is, [whether it was] clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.' " *Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir. 2012) (quoting *McKinney v. Richland Cnty. Sheriff's Dep't*, 431 F.3d 415, 417 (4th Cir. 2005)). Cases from the United States Supreme Court, the Fourth Circuit, or the highest court of the state in which the incident took place should be consulted in deciding whether a right was clearly established at the time the incident took place. *Id.* at 299-300.

The court therefore must first define the right in the context of this specific case. The court frames the right as follows: whether, on June 19, 2008, it was clear to a reasonable officer that it was unlawful to continue beating a suspect who was under arrest, who had both hands handcuffed behind her, who was pinned on the ground with the officer on top of her, and who was not actively resisting arrest.

A number of cases in the Fourth Circuit have held that arrested suspects have a right to be free from this precise type of excessive force. For example, in *Jones v. Buchanan*, 325 F.3d 520 (4th Cir. 2003), the Fourth Circuit held that an officer who attacks an "unarmed, handcuffed, and [secured]" individual is not entitled to qualified immunity. *Id.* at 531-32. Thus, as of 2003,

11

the principle that an officer may not continue assaulting a secured, unarmed suspect had been established. A number of cases from the Fourth Circuit reinforce this principle. *See, e.g., Valladares*, 552 F.3d at 390-91 (denying qualified immunity where officer had suspect under "full control" and then slammed suspect's head into a car twice); *Bailey*, 349 F.3d at 744-45 (denying qualified immunity in case where suspect initially resisted arrest but officers continued to use force after he was fully secured); *Kane v. Hargis*, 987 F.2d 1005, 1006-07 (4th Cir. 1993) (denying qualified immunity where suspect initially resisted arrest but police officer, after she was secured, "repeatedly push[ed] her face into the pavement, cracking three of her teeth, cutting her nose, and bruising her face"); *Mayard v. Hopwood*, 105 F.3d 1226, 1227-28 (8th Cir. 1997) (denying qualified immunity where police officer continued beating suspect after the suspect was placed in handcuffs and leg restraints).

As discussed, the court is required to take Plaintiff's version of the facts as true at this stage of the proceedings. Here, Plaintiff submits that Deputy Barber continued to "maul my face into the ground, hit me and started kneeing me in the back causing visual bruises" after she was fully secured. Aff. of Barbara Goodman [DE 43-4] at 3. Goodman also asserts that she was not resisting arrest at this point in the altercation: "I was not thrashing my arms, or moving them in any erratic way." *Id.* Taking these facts as established, Deputy Barber is not entitled to qualified immunity. Fourth Circuit case law clearly establishes that officers employ excessive force when they assault a suspect that has been physically restrained, and that suspects have a right to be free from such excessive force. *Jones*, 325 F.3d at 531-32; *Valladares*, 552 F.3d at 390-91; *Bailey*, 349 F.3d at 744-45. Thus, Goodman has established both prongs of the test for denying qualified immunity, and the motion for summary judgment, insofar as it relies on qualified immunity to defeat Goodman's alleged excessive force claims, is DENIED.

## B. Goodman's illegal arrest claim.

Goodman also asserts that her arrest for Resisting, Delaying, or Obstructing was illegal and that she is therefore entitled to relief for the alleged illegal arrest. Goodman bases this claim on the fact that the warrant for her arrest, which was completed by a state magistrate, mistakenly indicated that Goodman ran from Deputy Barber. Goodman also asserts that she was "neither represented by counsel nor properly advised by the District Court Judge as to her right to counsel." Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. [DE-43] at 11. Defendant admits that she was found guilty of Resisting, Delaying, or Obstructing an officer in state district court, and that the charges were subsequently dismissed on appeal to superior court.

Illegal arrest claims are analyzed under the Fourth Amendment: arrests are illegal when probable cause did not exist at the time of the arrest. *United States v. McCraw*, 920 F.3d 224, 227 (4th Cir. 1990). Probable cause exists where "the facts and circumstances within the [the officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Id.* (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Goodman was arrested for a violation of N.C. Gen. Stat. § 14-223, Resisting, Delaying, or Obstructing an Officer, which provides "If any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a class 2 misdemeanor." *Id.*

Here, Deputy Barber personally observed Goodman's stepfather twirl her around in an attempt to physically prevent an arrest. Goodman has presented no evidence to the court that she attempted to prevent her stepfather's actions in any way. Goodman therefore allowed her stepfather to move her in circles. The court finds that when a suspect allows a family member to

13

move her around in circles in an attempt to prevent the officer from handcuffing her, and the suspect offers no resistance to this activity, then a reasonably prudent police officer has probable cause to arrest the suspect for RDO. This conclusion is also supported by the fact that a North Carolina state district court found Goodman guilty of RDO. *See* N.C. Criminal Court Documents [DE-39-3].

Thus, no genuine issue of material fact exists as to whether Deputy Barber had probable cause to arrest Goodman for RDO. The fact that the state magistrate erroneously wrote that Goodman ran from Deputy Barber on the subsequently-transcribed arrest warrant does not change the fact that Deputy Barber had probable cause to make the arrest for RDO at the time Goodman resisted arrest. Similarly, the fact that Goodman may not have been properly advised of her right to counsel at trial does not affect whether Deputy Barber had probable cause to arrest Goodman at the scene. Deputy Barber's motion for summary judgment as to Goodman's illegal arrest claim is therefore ALLOWED.

## C. Goodman's state law malicious prosecution and false imprisonment claims.

Deputy Barber has also moved for summary judgment on Goodman's state law malicious prosecution and false imprisonment claims. Goodman concedes that Deputy Barber is entitled to summary judgment on these claims. Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. [DE-43] at 14. Thus, Deputy Barber's motion for summary judgment as to the malicious prosecution and false imprisonment claims is ALLOWED.

## D. Goodman's Assault and Battery Claims.

Finally, Deputy Barber moves for summary judgment as to Goodman's state law claims for assault and battery. Deputy Barber's primary argument is that North Carolina law allows officers to exercise reasonable force when effectuating an arrest, *see, e.g., State v. Anderson*, 40

14

N.C. App. 318, 321, 253 S.E.2d 48, 51 (1979), and that Deputy Barber's use of force was reasonable in this case. As discussed above, the court has found that genuine issues of material fact exist as to whether Deputy Barber's use of force was reasonable and that a reasonable jury could find that the force Deputy Barber employed excessive force. Deputy Barber is not entitled to summary judgment on the state law claims on this basis.

In a footnote in his brief, Deputy Barber also asserts sovereign immunity and public officer immunity as defenses to liability on the state law claims. Sovereign immunity prevents suits against the State, agencies of the state, and counties within the state.[4] *Charlotte-Mecklenburg Hosp. Auth. v. N.C. Indus. Comm'n*, 336 N.C. 200, 207, 443 S.E.2d 716, 721 (1994) ("The doctrine of sovereign immunity—that the state cannot be sued in its own courts without consent—is firmly established in North Carolina Law."), *superseded by statute on other grounds*, Act of April 19, 1993, ch. 679, sec 2.3, 1993 N.C. Sess. Laws 394, 397-99, *as recognized in Carolina Med. Ctr. v. Emp'rs & Carriers Listed in Exhibit A*, 172 N.C. App. 549, 616 S.E.2d 588 (2005); *Satorre v. New Hanover Cnty. Bd. of Comm'rs*, 165 N.C. App. 173, 176, 598 S.E.2d 142, 144 (2004) ("Sovereign immunity bars claims brought against the state or its counties . . . ."). However, sovereign immunity is waived to the extent a state agency retains liability insurance, but only up to the amount of the coverage. *Dawes v Nash Cnty.*, 357 N.C. 442, 445-46, 584 S.E.2d 760, 762-63 (2003); *Satorre*, 165 N.C. App. at 176, 598 S.E.2d at 144.

---

[4] Goodman's "official capacity" claims against Deputy Barber are actually claims against Sampson County, North Carolina. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity."). The court notes that Goodman failed to respond to Deputy Barber's Motion to dismiss the official capacity claims as they related to the federal constitutional violations, and this court dismissed those claims by order dated 27 December 2011. *See* Order [DE-24].

15

Plaintiff does not contest the argument that sovereign immunity applies to the state law assault and battery claim against Deputy Barber in his official capacity. Therefore, to the extent the jury awards damages against Deputy Barber acting in his official capacity (which is to say, awards damages against the Sampson County Sheriff's Department), the court will reduce the award to the amount of liability insurance coverage the Sampson County Sheriff's Department carried on June 19, 2008.[5]

Deputy Barber also asserts that North Carolina's public officer immunity doctrine bars the suit against him in his individual capacity. North Carolina public officer immunity "protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." *Campbell v. Anderson*, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003). However, public officials may be liable if their actions were "corrupt or malicious . . . or [they] acted outside of and beyond the scope of [their] duties." *Smith v. Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Grad v. Kaasa*, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Id.* at 313, 321 S.E.2d at 890-91 (quoting *Givens v. Sellers*, 273 NC. 44, 50, 159 S.E.2d 530, 535 (1968)).

Here, Goodman alleges that Deputy Barber grabbed her from behind and pushed her to the ground. After she was on the ground and fully secured, Goodman alleges that Deputy Barber continued to "maul my face into the ground, hit me and started kneeing me in the back causing

---

[5] Of course, if the jury award is less than the amount of insurance coverage, then the court will not disturb the judgment amount.

16

visual bruises." Aff. of Barbara Goodman [DE 43-4] at 3. A reasonable police officer would know that this behavior is contrary to his duty and injurious to the suspect. The alleged behavior also demonstrates a reckless indifference for the rights of others because Deputy Barber may have seriously injured Goodman. Thus, taking Goodman's version of the facts as true, a reasonable jury could find that Deputy Barber acted with malice and that he is not entitled to public officer immunity. Of course, Deputy Barber disputes these facts, creating a genuine issue of material fact for trial. Goodman's claims for assault and battery against Deputy Barber in his individual capacity and Deputy Barber's defense of Public Officer Immunity may therefore proceed.

## IV. Conclusion

For the foregoing reasons, Deputy Barber's Motion for Summary Judgment [DE-38] is ALLOWED in part and DENIED in part. Deputy Barber's Motion for Summary Judgment is ALLOWED as to the claims based on illegal arrest (part of Second Claim for Relief), false imprisonment (Third Claim for Relief), and malicious prosecution (Fifth Claim for Relief), and those claims are hereby DISMISSED. Deputy Barber's Motion for Summary Judgment as to the excessive force claim (part of Second Claim for Relief) and Assault and Battery (Fourth Claim for Relief) is DENIED.

SO ORDERED.

This the _16_ day of October, 2012.

JAMES C. FOX
Senior United States District Judge